IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GENA L. PHILLIPS,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) Civil No. **04-466-CJP**[1] |
| | ) |
| **JO ANNE B. BARNHART**[2], | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

## ORDER

**PROUD, Magistrate Judge:**

By written opinion dated January 30, 2004, Administrative Law Judge Anne C. Pritchett concluded that plaintiff Gena L. Phillips was not disabled, and that, despite two "severe" impairments (epilepsy and marijuana abuse), those disorders did not meet or equal one of the presumed disabling Medical Listings, and she was capable of performing past work as a cashier. The Appeals Council of the Social Security Administration denied plaintiff's request for review, making ALJ Pritchett's decision the final decision of the Agency. Pursuant to 42 U.S.C. § 405(g), plaintiff now seeks review of the administrative decision denying her a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i), Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382.  **(Doc.**

---

[1]Pursuant to 28 U.S.C. § 636(c)(1), upon the consent of the parties **(Docs. 4 and 8)**, U.S. District Judge J. Phil Gilbert referred this case to the undersigned Magistrate Judge for any and all proceedings and entry of judgment **(Doc. 15)**.

[2]Plaintiff's complaint does not refer to the Commissioner of Social Security by name; this Court takes judicial notice that Jo Anne B. Barnhart became Commissioner of the Social Security Administration November 9, 2001.

1

**1).** The administrative record and the parties' briefs are before the Court. **(Docs. 7, 9 and 13).**

## Issues Presented

Plaintiff Phillips argues:

1. The ALJ erred at Step 2 by finding that plaintiff's history of cannabis abuse was a severe impairment because:

    a. There are no assessments of cannabis abuse by a mental health professional, substance abuse counselor or state reviewing doctor;

    b. There is no stated rationale for the severity or its impact; and

    c. There is no logical bridge or specific evidence between cannabis use and seizures;

2. The ALJ erred at Step 3 by finding that plaintiff's epilepsy did not meet or equal Listings 11.02 and/or 11.03 because only a perfunctory analysis– a single sentence– is offered, which does not address:

    a. Plaintiff's testimony; and

    b. Five third-party seizure descriptions of plaintiff's seizure activity;

3. The ALJ erred in finding plaintiff not entirely credible, particularly in light of:

    a. Plaintiff's admissions of marijuana use and previous noncompliance with her medication regimen;

    b. Citing plaintiff's calendar notation that she "rode horses w/ Ivan," despite stating personal notions would not be relied upon;

    c. Supporting third-party seizure activity reports;

    d. Unemployment Insurance benefits were denied because medical restrictions prevented her from working;

    e. Plaintiff's driver's license was taken away due to her seizures; and

    f. There are records of plaintiff being treated for seizures when tests revealed she had therapeutic levels of medication; and

4. The ALJ erred by ignoring the vocational expert's testimony that uncontrolled

>seizures would preclude plaintiff's ability to work as a cashier, and not posing a hypothetical based on the ALJ's finding that plaintiff's seizures were not totally controlled.

**(Doc. 9).**

The defendant Commissioner generally counters that sufficient evidence in the record supports the ALJ's decision. The defendant contends plaintiff has ignored the requirement that she follow prescribed antiepileptic treatment, and that an ALJ must consider the role drugs may play in the precipitation of seizures. Defendant also asserts that there is no three month period where plaintiff was compliant but nevertheless had seizures more frequently than once per month. From defendant's perspective, the ALJ's discussion of all dispositive evidence is sufficient to support her findings. **(Doc. 13).**

## Applicable Legal Standards

To qualify for DIB or SSI[3], a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3)**

---

[3]The statutes and regulations pertaining to DIB are found at **42 U.S.C. § 1382, et seq.**, and **20 C.F.R. pt. 404**. The statutes and regulations pertaining to SSI are found at **42 U.S.C. §§ 1382 and 1382c, et seq.**, and **20 C.F.R. pt. 416**. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, **20 C.F.R. § 416.925** detailing medical considerations relevant to an SSI claim, relies on **20 C.F.R. pt. 404 subpt. P**, the DIB regulations. Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations/Section 404 out of convenience.

**and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. §§ 416.920(b-f) and 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether plaintiff was, in fact, disabled, but whether ALJ Pritchett's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See Books v. Chater, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997).**  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  **Sample v. Shalala, 999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. ***Garfield v. Schweiker*, 732 F.2d 605 (7th Cir.1984).** If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Secretary at step four to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).**

### Synopsis of Relevant Evidence Regarding Plaintiff's Condition

Plaintiff Gena Phillips applied for SSI, DIB and a Period of Disability, alleging the onset of disability as of August 22, 2002. **(Doc. 7 ("R."), pp. 49-52 and 343-346).** Plaintiff claims disability due to uncontrolled epilepsy, both grand mal and petit mal seizures. **(R. 372 -375 and 379-380).**

According to plaintiff, she began having seizures in 1997. **(R. 63).** An EEG in December 2001 reflected seizure activity, and a March 2002 EEG was "moderately abnormal." **(R. 246 and 251).** Plaintiff testified that she typically has several grand mal seizures at a time, once or twice per month. **(R. 372-373).** Sometimes she appreciates warning signs, but not always. **(R. 373).** According to plaintiff, and as extensively documented in her medical records, during a seizure she is unconscious, she thrashes about, chews her mouth and tongue, often falls and injures herself, and she loses bowel or bladder control. **(R.373).** After a seizure, she is generally confused, has trouble regaining her balance, and she sleeps for five or six hours, or as long as a day. **(R.374).** Plaintiff also describes experiencing brief petit mal seizures once a week, where she stares off into space and her eyes roll back. **(R. 379-380).** Plaintiff's last

seizure before the January 2004 hearing was November 24, 2003, when she was treated at the hospital for a grand mal seizure. **(R. 375 and 113).** Plaintiff's father and grandmother report an additional seizure about three weeks after the hearing. **(R. 104 and 105).**

Five people who have witnessed plaintiff's seizures issued statements generally mirroring plaintiff's own description of her seizures. However, descriptions of the length of the seizures vary. Plaintiff's father describes plaintiff's seizures as usually lasting two or three minutes, or five minutes, and he noted that plaintiff may have several seizures in a row. **(R. 75 and 105).** Plaintiff's friend, Chester Carnes, with whom she lives, alternately describes seizures as typically lasting 30 minutes to an hour, and usually lasting only a few minutes . **(R. 85 and 106).** Plaintiff's former supervisor, Clifford Morehead, also described a 30 minute to an hour time frame. **(R. 86).** Plaintiff's grandmother stated that plaintiff's seizures sometimes lasted an hour; and plaintiff's co-worker, nurse Rhonda Johnson, indicated plaintiff lost consciousness for 30 minutes or more. **(R. 87 and 104).** Hospital records reflect multiple seizures per episode, but generally reflect that the seizures lasted only a few minutes each; for example, June 26, 2002, emergency room admission records reflect plaintiff experienced two to three seizures during a 20 minute period at the nursing home. **(R. 183).**

During the January 2004 hearing before ALJ Pritchett, plaintiff's personal calendar was admitted into evidence because it served as a record of seizures, with the ALJ and plaintiff's counsel agreeing that information that was "not germane"– such as personal notations about dates with men-- would be ignored, but the ALJ made clear that information other than seizure notations could be relevant. **(R. 375-377).** The calendar reflected that plaintiff suffered multiple seizures in August, 2002; no seizures in September 2002 (although there is a hospital record of a

seizure on September 24, 2002 **(R. 229)**); multiple seizures each month for the months of October 2002 through February 2003; no seizures in March 2003; one seizure in April 2003; one seizure in May 2003; multiple seizures in June 2003; one seizure in July 2003; multiple seizures in August 2003; one seizure in September 2003; and multiple seizure in November 2003– the last seizure plaintiff testified to; and a seizure in December 2003, although plaintiff did not recall it during the hearing or in other documentation filed after that month. **(R. 111-128;** *see also* **R. 340).** The calendar also recorded plaintiff going horseback riding in November 2003. **(R. 113).**

When she is not experiencing seizures, plaintiff has no other impairments or ailments. **(R. 381).** Plaintiff has been prescribed Depakote, an anticonvulsant, which is the only medication plaintiff takes. **(R. 370).** Plaintiff states that she experiences no side effects from her medication. **(R. 68).** A review of hospital and emergency room records for the period between March 20, 1999, and September 19, 2003, reveals that plaintiff sought and received medical care for seizures on– by the Court's count– 29 occasions. Plaintiffs statements and/or tests indicate plaintiff was noncompliant with her medication on 15 occasions, was using marijuana on 11 occasions, and was both noncompliant with her medication *and* using marijuana on five occasions. **(R. 137-324).** On nine occasions neither noncompliance, nor marijuana use is noted. By plaintiff's count, there were ten occasions when she had seizures while her anti-convulsive medication was within therapeutic range; however, the Court notes that on one of those occasions, September 19, 2003, plaintiff's seizure was attributed in part to "anticonvulsant withdrawal." **(R. 360 and 314).**

Plaintiff explained, and medical records reflect, that there was a period of time, generally

from March 1999 to September 2001 when she often ran low and rationed her medicine because she could not afford it.  (*See* **R. 141, 148, 161 and 371**).  In September 2001 plaintiff's doctor wrote that he did not really understand plaintiff's financial explanation for noncompliance, since she had never brought it up before; he was going to try to get her medication through an indigent program and he instructed her to just ask him for free samples in the future.  **(R. 161)**.  Yet, she was still citing expense as the reason for noncompliance in January and June 2002.  **(R. 192 and 204)**.

In September 2001, plaintiff's doctor gave her "a long lecture" on the necessity of taking her medication and avoiding drugs.  **(R. 162).**  June 2002, and January 13, 2003 medical notes reflect that plaintiff was told not to use drugs.  **(R. 184 and 283).**  In June 2002 plaintiff signed a written form acknowledging that she should not use drugs.  **(R. 324).**  Plaintiff testified that she had no recollection of these warnings about drugs due to her confused state after suffering a seizure, and she asserts her family and friends never relayed the doctor's warnings to her.  **(R. 384-385).**  However, plaintiff also acknowledged being told that drugs affect the way her medicine works in her system.  **(R. 379).**  At the January 2004 hearing, plaintiff testified that she had stopped using drugs– it had been "almost a month;" and she had been trying to take her medication as prescribed.  **(R. 371 and 379).**

Plaintiff held a series of jobs in 2002, but none for longer than two months.  **(R. 64)**.  She worked as a cashier at a gas station, housekeeper at a hotel, and last as a housekeeper in a nursing home.  **(R. 64).**  According to plaintiff, she cannot hold work because of her seizures; for example, at the nursing home she was told that it was too risky to risk having her have seizures around the residents, and her supervisor could not constantly monitor her.  **(R. 380-381).**

Plaintiff testified that she felt ready, willing and able to work, but she was denied unemployment insurance benefits because she was considered medically unable to work. **(R. 60 and 377-378).** Plaintiff describes her daily activities as including performing routine chores around the house, although she is nervous about cooking if she is feeling uneasy about her seizure activity. **(R. 100).** Also, plaintiff cannot drive on doctors' advice, because she had a seizure-related accident, and because, legally, she has to be seizure free for three months. **(R. 70, 150, 161).**

Two reviewing agency physicians, Drs. Pardo and Vincent, opined that plaintiff's seizures are uncontrolled, but they noted evidence that plaintiff is not compliant with her medication regimen, and she has a history of cannabis abuse. **(R. 136).** They noted plaintiff's physical exam was unremarkable. **(R. 136).** Drs. Pardo and Vincent concluded that plaintiff's only restriction is that she should never use a ladder, rope or scaffold, or work around heights or hazardous machinery. **(R. 131 and 136).** Dr. John Noonan, M.D., opined that plaintiff had uncontrolled seizures, and she was "probably incapable of any type of gainful employment." **(R. 276).**

## Vocational Evidence

Vocational expert Thomas Upton testified that plaintiff's past work was at the light and sedentary exertional level, and was both unskilled and semi-skilled. **(R. 385-386).** Upton testified that a person of plaintiff's age, and with her education and work experience, who had to avoid all exposure to hazards and who could not climb ladders, ropes or scaffolds, could perform multiple jobs, each available by the thousands in the regional economy– including work as a cashier, telemarketer, receptionist, parking lot attendant and laundry worker. **(R. 387).** If plaintiff's testimony regarding uncontrolled, frequent seizures were taken as true, Upton opined

no such jobs would be available.  **(R. 388-389).**  Upon questioning by plaintiff's counsel, Upton testified that if a person had a seizure at any time while working, that person could not complete any of he aforementioned jobs.  **(R. 388-389).**

## ALJ Pritchett's Decision

ALJ Pritchett found that plaintiff had a seizure disorder and abused marijuana– both deemed severe impairments, but not meeting or equaling any of the presumptively disabling impairments for purposes of 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A. **(R. 17 and 19).** Consistent with vocational expert Upton's testimony, plaintiff was found to be able to perform her past work as a cashier. **(R. 19).**  Therefore, the ALJ concluded plaintiff is not disabled.  **(R. 20).**

In finding that plaintiff had a substance abuse impairment, the ALJ cited medical records reflecting that plaintiff had repeatedly been found noncompliant with her medication regimen, and had also repeatedly admitted to using or tested positive for marijuana, despite having been cautioned by doctors to stop using marijuana.  **(R. 17).**  In concluding the impact of drug abuse was "moderate," ALJ Pritchett used the "B" criteria from Section 12.09 of 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, relative to "Substance Addiction Disorders."  **(R. 17).**  The ALJ noted that it was "interesting" that plaintiff had not had a seizure since she quit using marijuana– one month prior to the hearing.  **(R. 18).**

The ALJ did not find plaintiff's testimony entirely credible relative to the frequency of her seizures.  **(R. 18).**  The ALJ observed that plaintiff was not always compliant with her medication; the ALJ also opined that horseback riding twice in November 2003, indicated that plaintiff was not overly concerned about having seizures without warning.  **(R. 18).**  Dr.

Noonan's opinion that plaintiff's seizures were uncontrolled with medication was discounted because Dr. Noonan had simultaneously recorded that all tests were normal, meaning that his opinion had to have been based on plaintiff's subjective reports.  **(R. 18).**  Nevertheless, ALJ Pritchett concluded, "the claimant does clearly have a seizure disorder that is not totally controlled by medication."  **(R. 18).**

Concluding that plaintiff had no exertional limitations, and relying on the vocational expert's testimony, the ALJ found plaintiff could perform her past work as a cashier, of which there were 6,300 such jobs in the region.  **(R. 19-20).**

## Analysis

Plaintiff easily satisfies the first step in the five-step analytical test; she is not currently employed, and has not worked since August 2002.  At the second step in the analytical process, ALJ Pritchett found that plaintiff had a seizure disorder and abused marijuana, both deemed severe impairments.  Plaintiff takes issue with the inclusion of marijuana abuse as a severe impairment, and questions the link between marijuana use and seizure activity.

The ALJ utilized the "B" criteria from Section 12.09 of 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, relative to "Substance Addiction Disorders," to analyze the impact of using marijuana on plaintiff's ability to function.   The introduction to Section 12.00, regarding "Mental Disorders" provides in pertinent part:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

* * *

The structure of the listing for substance addiction disorders, 12.09, is also

>different from that for the other mental disorder listings. Listing 12.09 is
>structured as a reference listing; that is, it will only serve to indicate which of the
>other listed mental or physical impairments must be used to evaluate the
>behavioral or physical changes resulting from regular use of addictive substances.

**20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.00(A).**

Section 12.00 further explains that the existence of a medically determinable impairment is established "by medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings)." **20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.00(B).** Assessments by a mental health professional, substance abuse counselor or state reviewing doctor are not specifically required, as plaintiff intimates.

In any event, as Section 12.00(A) makes clear, Listing 12.09 regarding substance abuse disorders is not like the other mental health listings. Section 12.09 pertains to "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." **20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.09.** The required level of severity for these disorders is met when the requirements in any of nine listed physical impairments are satisfied, including seizures, as evaluated under Sections 11.02 or 11.03. **20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.09(I).**

Section 12.00 does provide that assessment of the severity of a mental disorder is measured "according to the functional limitations imposed by your medically determinable mental impairment(s)," functional limitations are assessed "using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." **20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 12.00(C).** However this Court does not consider adherence to this provision necessary, since Listing 12.09(I) is fully satisfied if Listing 11.02 or 11.03, regarding grand mal and petit mal seizures, is

satisfied.

Insofar as plaintiff challenges the ALJ linking marijuana use and seizure activity, the multiple warnings about not using marijuana and plaintiff's own admission that she was specifically told that *drugs affect the way her medicine works in her system* provide sufficient evidence to sustain the use of Section12.09.

At the third step neither plaintiff's seizure disorder, nor her marijuana abuse were found presumptively disabling in accordance with Listing 11.02, relative to grand mal seizures, and 11.03, relative to petit mal seizures. "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." **Barnett v. Barnhart, 831 F.3d 664, 668 (7th Cir. 2004).**

The pertinent Listings are as follows:

11.02 Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; *occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.*
    A. Daytime episodes (loss of consciousness and convulsive seizures) or
    B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

11.03 Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; *occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.* With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

**20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, §§ 11.02 and 11.03 (emphasis added).**

> *Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment. Adherence to prescribed antiepileptic therapy can ordinarily be*

> *determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy*. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels. *Should serum drug levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in absorption of metabolism of the drug.* Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. *When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels.* Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this medication must be also assessed. *Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level*.

**20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 11.00 (emphasis added).** Similarly, 20 C.F.R. § 404.1530 requires adherence to prescribed treatment, or one will be not be found disabled.

Plaintiff argues that the ALJ erred by failing to address plaintiff's testimony and the five third-party descriptions of her seizure activity in concluding that plaintiff did not satisfy Listings 11.02 and 11.03.  Although the ALJ's decision is devoid of reference to the specific Listings at issue, plaintiff obviously perceived that when the ALJ discussed grand mal and petit mal seizures Listings 11.02 and 11.03 were implicated.   Plaintiff has turned a blind eye to the ALJ's discussion of evidence that plaintiff has been noncompliant with her medication by having subtherapeutic levels, and has used marijuana up until almost one month before the January 2004 hearing.  The ALJ's failure to include the specific Listing citations in her analysis does not change the evidence or her findings.

"[W]here an ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis, reversal and remand is required." ***Rice v. Barnhardt*, 384 F.3d 363, 370**

14

**(7th Cir. 2004).**  However, the ALJ's analysis was not perfunctory, as plaintiff attempts to suggest by quoting a single sentence finding, while ignoring two pages of analysis of the evidence.  The Court of Appeals for the Seventh Circuit stated in *Rice v. Barnhardt*:  "We have long held that an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence." ***Id.* (quoting *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir.1995)).**

Insofar as the ALJ discounted plaintiff's testimony and ignored the five third-party seizure descriptions, there is no error.  Plaintiff testified that she experienced grand mal seizures once or twice each month, yet her personal calendar and the medical documentation revealed months when plaintiff did not experience seizures.  According to plaintiff's own testimony, her seizures lasted only a few minutes each, not up to an hour as several of the third-party statements indicated.  Chester Carnes flip-flopped between estimates that the seizures lasted an hour and only a few minutes.  Rhonda Johnson described a 30 minute seizure, when hospital records described the same episode as two to three seizures during a 20 minute period.  With that said, the Court recognizes that much of the confusion can be attributed to the fact that plaintiff typically experiences multiple seizures in a single episode.  In any event, plaintiff's accounts and the third-party accounts are not required in light of the multiple medical records that describe seizures observed by medical personnel and reported upon arrival at the hospital by those who brought plaintiff to the hospital.  *See* **20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, § 11.00(A).**

The ALJ's finding that plaintiff was not totally credible is also raised in connection with the fourth step in the sequential analysis, where the ALJ concluded plaintiff's residual functional capacity was not limited with respect to exertional requirements, but she must avoid all exposure to hazards and never climb ladders, ropes or scaffolds.  An ALJ's credibility determination will

not be overturned unless it is "patently wrong" and not supported by the record. ***Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003).** An ALJ's credibility determinations are given "special deference because the ALJ is in the best position to see and hear the witness and determine credibility." ***Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).**

Plaintiff exaggerates the ALJ's statements regarding credibility. Plaintiff was not found entirely not credible; rather, the ALJ stated, "After reviewing the evidence, the undersigned finds the claimant's testimony as to the frequency of her seizures is not entirely credible." **(R. 18).** The ALJ also specifically found, "The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." **(R. 19).** The fact that plaintiff admitted her drug use and previous noncompliance is irrelevant to those two findings. Whether plaintiff was denied unemployment insurance benefits or a driver's license are also irrelevant. Residual functional capacity determinations are reserved exclusively to the Commissioner. **20 C.F.R. § 404.1527(e).**

Plaintiff cites a number of dates where plaintiff had seizures despite having therapeutic levels of her medication. **(R. 360).** However, plaintiff does not mention the many surrounding seizure incidents where plaintiff had subtherapeutic levels and/or she was using marijuana. When all of the seizure dates are viewed in unison there is no three month period when plaintiff had therapeutic levels of medication *and* was not using marijuana. By plaintiff's own admission, she did not stop using marijuana until just a month before the hearing; therefore, there was simply insufficient evidence to assess whether her seizures are controlled during a three month period when she has taken her medication as directed, and when any interference from drugs is eliminated.

Plaintiff takes issue with the ALJ's use of notations about her going horseback riding. Plaintiff indicates that it was agreed that no personal notations would be relied upon by the ALJ. However, a review of the record reveals that the ALJ made clear that any relevant notation would be considered.  **(R. 375-377).**   The ALJ's remarks about plaintiff horseback riding are superfluous.  By plaintiff's own admission, when she is not having seizures she has no limitations to speak of; she considered herself ready, willing and able to work.  <u>Again</u>, the fact that plaintiff has not followed prescribed treatment, which is documented to include both consistently taking her medication and not using marijuana, is <u>fatal</u> to her disability claim.  **20 C.F.R. § 404.1530;** *Barrett v. Barnhart*, **355 F.3d 1065, 1068 (7th Cir. 2004);** *Godbey v. Apfel*, **238 F.3d 803, 809 (7th Cir. 2000); and**  *Shramek v. Apfel*, **226 F.3d 809, 812 (7th Cir. 2000) .** Similarly, the fact that the ALJ acknowledged that plaintiff's seizures are not totally controlled does nothing to change the situation.  Until plaintiff can demonstrate that she has followed prescribed treatment in all respects, or shown a good reason why she cannot, she cannot be found disabled.  Therefore, the vocational expert's testimony that a person with uncontrolled seizures could not perform any work is irrelevant.

**IT IS THEREFORE ORDERED** that, for the aforestated reasons, the Agency decision denying plaintiff Gena L. Phillips a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i),

Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 1382, is affirmed in all respects. Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED: September 29, 2005**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**
